ILENE J. LASHINSKY (#003073)
United States Trustee
District of Arizona

RENEE SANDLER SHAMBLIN (#017473)
Trial Attorney
230 N. First Ave., Suite 204
Phoenix, Arizona 85003-1706
Phone: (602) 682-2616
Email: Renee.s.Shamblin@usdoj.gov

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>J. LEVINE AUCTION & APPRAISAL LLC,<br><br><br>Debtor. | In Proceedings under Chapter 11<br><br>Case No. 2:19-BK-02843-SHG<br><br>**UNITED STATES TRUSTEE'S EMERGENCY MOTION TO APPOINT CHAPTER 11 TRUSTEE; OR ALTERNATIVELY, TO CONVERT CASE TO CHAPTER 7** |

The United States Trustee for the District of Arizona ("UST"), by and through the

undersigned attorney and in accordance with the administrative duties set forth in 28 U.S.C §

586(a), hereby respectfully moves this Court for the immediate appointment of a Chapter 11

Trustee in the above captioned case, for cause, including fraud, dishonesty, incompetence, gross

mismanagement, and breach of fiduciary duty to creditors, or in the alternative, to convert this case

to Chapter 7.    J. Levine Auction & Appraisal LLC (the "Debtor") is an auction house.  Prior to the

March 15, 2019 petition date, the Debtor stole over $1 million in sales proceeds from 363 of its

consignor clients (the "Consignors").  The Debtor preyed upon a vulnerable population of people,

as its Consignors were frequently elderly people who were grieving the loss of a loved one, were

selling their most valuable personal property to make ends meet,[1] or were downsizing in

---

[1] Such as one consignor, an 86 year old widow who, as she describes it, "outlived her savings," and
consigned personal property because she did not want to be a burden on her children.

retirement.[2] The Debtor contracted to sell its Consignors' personal possessions at auction and to deliver to them their sales proceeds, less the Debtor's sales commission. While the Debtor did sell its Consignors' personal possessions at auction, and it did collect the sales proceeds from the purchasers, the Debtor failed to turn over the sales proceeds to the Consignors. The Debtor thus far has been unable to adequately explain what it did with over $1 million of cash sales proceeds that belonged to its' Consignors. Not only is over $1 million in Consignors' sales proceeds missing, but the Debtor is also missing $2.7 million that it borrowed from various lenders in the 12 months leading up to this bankruptcy.

Beyond that gross pre-petition misconduct, there are numerous other grounds that compel the immediate appointment of a Chapter 11 trustee or conversion to Chapter 7. The Debtor's owner has a history of using the Debtor as a personal piggy bank, taking almost $300,000 in cash from the Debtor in order to purchase residential real estate in his own name. Moreover, the Debtor's post-petition profits are abysmal, as the Debtor is generating less than half of the income it projected in its cash collateral budget, and is currently operating at a loss. The Debtor continues to drain estate funds by paying an exorbitant salary to a childhood friend of the Debtor's owner, and by paying unnecessary luxury expenses for a BMW leased to the Debtor's owner – all at the expense of unsecured creditors. As a result, the longer the Debtor remains in Chapter 11 as a debtor-in-possession, the worse off creditors will be.

Given the Debtor's conduct, it would be contrary to both the best interest of the estate and to the integrity of the bankruptcy system, to allow it to remain a Chapter 11 debtor-in-possession.

---

[2] Such as another consignor, who consigned everything in her home as she was retired and moving to Canada. "I gave them all my household, everything that was in my house. Furniture, paintings, everything. And I followed your auctions, but every time I called and said, why aren't you paying the money, they said it will come. . . . Where is the decency in that, sir? . . . I'm leaving this country. I have nothing to take with me. Nothing." *See* April 16, 2019 341 meeting transcript, pgs. 47-48, attached as **Exhibit A**.

Therefore, the UST requests the Court to either appoint a Chapter 11 trustee or to convert this case to Chapter 7. This Motion is supported by the accompanying Memorandum of Points and Authorities, **Exhibits A** through **Z-1**, and the entire record in this case.

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.** **J. LEVINE AUCTION & APPRAISALS**

    **A.** **Background & Operations.**

        The Debtor is an auction house owned by Joshua Levine. It leases a 75,000 square foot facility in downtown Phoenix located at 915 W. Watkins Road, and conducts weekly online auctions through its website www.jlevines.com, and its phone app. It auctions fine art, jewelry, furniture, rugs, firearms, vehicles, and more. The Debtor advertises in newspapers, Facebook, and in local television news segments, frequently to people who are selling items inherited from deceased loved ones or who are retired and downsizing. It promotes itself as "one of the great success stories in the auction world. . . . A seller's best friend and buyer's paradise." *See* page from the Debtor's website, attached as **Exhibit B**.

    **B.** **The Debtor Does Not Own the Items it Sells,**
           **Nor Does it Own the Sales Proceeds.**

        The Debtor, as an auction house, does not own the items it sells, nor does it own the sales proceeds. With few exceptions, it does not expend funds to purchase inventory. Instead, the Debtor takes items *on consignment* from Consignors and acts as an intermediary between the Consignor and the third-party buyer in order to sell the consigned items at auction. At all times, until the consigned property is paid for and delivered to the winning buyer from the auction, the Consignor retains title to the property. The Debtor's standard auction contract provides as follows:

> Seller [the Consignor] retains title to and is responsible for all property until title is conveyed to the buyer(s). [Consignor] bears the risk of loss for the property and accepts sole responsibility for obtaining insurance coverage on all property. [Consignor] shall not request the return of all or any part of the property once deliver (sic) to Auctioneer [the Debtor]. Neither [the Debtor] nor any

representative of [the Debtor] is a bailor of, or responsible or liable for loss of, or damage as a result of theft, fire or otherwise.

*See* Auction Contract attached hereto as **Exhibit C**.[3] Therefore, from the time the Debtor obtains the consigned property to sell, to the time the Debtor delivers the consigned property to the buyer, title of the property never passes to the Debtor. Title of the property always remains with the Consignor until the property is paid for and delivered to the buyer. The Auction Contract further provides as follows:

[Consignor] hereby authorizes [the Debtor] *to receive and accept, on behalf of [the Consignor], the proceeds of the sale* or auction in the form of cash or check or credit . . . .

[The Debtor] shall: . . . D. deduct its commission from the gross proceeds of the sale and any other applicable fees and costs. E. provide the net proceeds from the sale, approximately 30 to 45 business days from the date of all payments received to [the Consignor].

*See* **Exhibit C** (emphasis added**)**. Although the Debtor is authorized to accept the proceeds of the sale, *it is doing so only on the Consignor's behalf*, and is only holding the funds until they are transferred to the Consignor. The Debtor has no ownership interest in either the consigned property or the sales proceeds. The Debtor's only ownership interest comes in the form of its commission, which is typically 30% of the sales proceeds, and which it is authorized to take from the sales proceeds. The Debtor generates additional revenue by charging buyers a "buyer's premium," which is typically a 20% surcharge added to the winning bidder's sale price, and is paid by the winning bidder. For example, if an item at auction had a closing "hammer price" of $100, the Debtor would not collect $100 from the buyer, but would collect $120 from the buyer. Of this amount, $20 is the

---

[3]This particular auction contract, signed just 11 days before the Debtor's March 15, 2019 petition date, was attached to claim no. 47 in the Court's claims registry.

"buyer's premium," which the Debtor keeps, $30 is the Debtor's commission, which the Debtor keeps, and $70 are the sales proceeds that are to be delivered to the Consignor.

### C.      The Debtor Has a Fiduciary Duty to Its Consignor Clients.

The Debtor, as an auction house, has both an agency and a fiduciary relationship with the consignor. *See* Alexandra M.S. Wilson, *The Business of Art Theft:  Assessing Auction House Standard of Care and the Sale of Stolen Cultural Property,* 4 Am U. Bus. L. Rev. 505, 510 (2016). The Debtor is acting as a sales agent for the Consignor, and it has a fiduciary responsibility to the Consignor to obtain the best possible sales price and to *safeguard the sales proceeds* until they are transferred to the consignor. As stated by Wilson,

> The auction house must act in the utmost good faith and in the best interest of the principal, the consignor, at all times. A breach of fiduciary duty could give rise to liability on the part of the auction house as agent for the consignor as principal, whether the cause of action is based in contract or negligence. Further, the auction house is also responsible for the safekeeping of the consigned work for sale and the collection and distribution of the auction proceeds.

Id. at 510.

In sum, the Debtor does not own the property it sells, nor does it own the sales proceeds. Instead, the Debtor is entrusted by its Consignor clients, to whom it owes a fiduciary duty, to collect the cash sales proceeds before transferring the cash to the Consignor (less the Debtor's sales commission & fees).

### D.      The Debtor Reports Huge Losses and Hires Bankruptcy Counsel.

Despite its claims of being "one of the great success stories of the auction world,"[4] the Debtor reported substantial losses in 2016, 2017 and 2018.   Although the Debtor earned roughly 41% of every sale (comprised of its 30% commission from the Consignor's sales proceeds, and the

---

[4] *See* printout from the Debtor's website at **Exhibit B**.

additional 20% buyer's premium it took from the buyers),[5] it reported a loss of $713,665 in 2016, a loss of $1,654,035 in 2017,[6] and a loss of $1,792,740 in 2018.[7]

Even though the contracts with each of its Consignors required the Debtor to pay Consignors their sales proceeds within 30 to 45 days, the Debtor did not do this. Unbeknownst to the Consignors, the Debtor had a practice of using the Consignors' cash sales proceeds to pay personal expenses of the Debtor's principal, Josh Levine, as well as for the Debtor's operating expenses. The Debtor would then borrow money from lenders to obtain cash to pay consignors.[8] It was a classic "robbing Peter to pay Paul" situation. This scheme of using Consignors' funds for personal and operating expenses, and then borrowing funds to pay Consignors would have gone on indefinitely, but for the fact that ultimately, the Debtor ran out of new lenders from which to borrow, and its previous lenders began to take aggressive collection actions.

On December 19, 2018, the Debtor retained Sacks Tierney as bankruptcy counsel and paid it $5,000.00. The Debtor made subsequent payments to Sacks Tierney of $8,000.00 on February 27, 2019, and of $27,301.16 on March 11, 2019. *See* docket no. 107, p. 2 of SOFA.

### E. In an Attempt to Legitimize Its Conversion of the Consignor's Funds, The Debtor Files Bankruptcy

On March 15, 2019, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date"). Out of the 400 non-priority unsecured creditors listed in its bankruptcy schedules, 363 of them are debts owed to Consignors. These 363 "consignment claim" creditors on Schedule F, are owed amounts ranging from $10 to $135,800, and totaling $1,068,933.99. For each of the 363 Consignor claims, the Debtor sold the Consignors' personal property and collected

---

[5] *See* line items for Buyer's Premium and Consignor Payments in Budget attached to Debtor's Cash Collateral Motion, at docket no. #10, and attached hereto as **Exhibit D.**
[6] *See* selected pages of Debtor's 2016 and 2017 tax return, attached as **Exhibit E.**
[7] *See* Debtor's 2018 profit and loss statement, attached as **Exhibit F.**
[8] *See* pgs 81-83 & 104 – 105 of **Exhibit A**.

the cash purchase price for each sale. The Debtor also collected and retained its 30% commission and 20% buyer's premium. The only thing the Debtor did not do was to provide the Consignors with their sales proceeds. As described above, the sales proceeds were owned by the Consignors. It was *their* money – the Debtor's only right to it was to "receive it. . . . on behalf of" the Consignor, to take its commission & fees, and to transfer the rest to the Consignor. Instead, the Debtor used the Consignors' money, and then listed the amount of the sales proceeds that it should have provided to each Consignor as a debt in its bankruptcy case.[9]

In Arizona, a defendant commits theft if he converts, for an unauthorized term, the property of another that was entrusted to such defendant, or that was placed in such defendant's possession for a limited, authorized term or use. *See* A.R.S. 13-1802(A)(2). Here, the Debtor had lawful possession of the Consignors' funds, only for the limited purpose of collecting payment and taking its commission. Once that occurred, the funds were to be provided to the Consignors. Instead of complying with its legal and ethical duty to its Consignors, the Debtor used the Consignors' sales proceeds for countless other purposes, all of which are outside the limited scope of its authorized use, and as such, the Debtor's actions appear to violate the Arizona statute for theft.

The Debtor's conversion of Consignor funds occurred not just once or twice, but no less than *363 times*. Given the magnitude and scope of that conversion, and the Debtor's itemization of each of its Consignor victims as "creditors" in this bankruptcy, it seems as though the Debtor is

---

[9] Adding insult to injury, the Debtor entered into many of these consignment auction contracts with its client victims *after* the date it hired bankruptcy counsel. The Debtor conducted **twelve (12) auctions** between December 15, 2018 and its March 15, 2019 petition date. Because it had already retained bankruptcy counsel, and given the Debtor's debt obligations to its numerous lenders, the Debtor very likely knew it was not going to give many of these Consignors their sales proceeds at the time it took their personal belongings.

attempting to use this bankruptcy as a shield for what is arguably a criminal enterprise. The amount the Debtor listed in its schedules for each individual Consignor is the precise amount that the Debtor was obligated to transfer to each of the Consignors from the completed sale of his or her personal property. Instead of providing its Consignors *with their own funds*, the Debtor, without authority, wrongfully converted their funds for its own purposes. In a creative attempt to "legitimize" this theft and disguise these victims as creditors, the Debtor listed the sales proceeds that rightfully belong to each of its Consignors as debts in this bankruptcy case. However, this is not a typical debtor/creditor situation. These Consignors are not lenders, or vendors, or service providers. Instead, these Consignors (who are now listed as creditors), were victims of fraud, (or more likely theft or embezzlement), on a massive scale, the uncontroverted evidence of which is contained in the Debtor's own Schedule F, on file with this Court.

## II.     <u>THIS MOTION IS MANDATORY UNDER 11 U.S.C. § 1104(E)</u>

Section 1104(e) of the Bankruptcy Code provides, in relevant part, that "[t]he United States Trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or members of the governing body who selected the debtor's chief executive or chief financial officer, participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor . . .". *See In re The 1031 Tax Group, LLC*, 374 B.R. 78,87 (Bankr. S.D.N.Y. 2007 ("the U.S. Trustee must seek an order requiring appointment of a chapter 11 trustee whenever the 'reasonable grounds to suspect' standard is met").

Here, the Debtor is organized as a limited liability company and Josh Levine is its only member. At all times prior to the Petition Date, Mr. Levine was the Debtor's CEO and COO, and he made the management decisions for the Debtor. After the Petition Date, Mr. Levine handed the CEO and COO position to one of his childhood friends, Mr. Greg Granger. Despite Mr. Granger's

employment as CEO and COO, Mr. Levine continued to participate in a management role.  Among other things, Mr. Levine worked full time for the Debtor, he signed the SOFA & Schedules, he prepared and signed the monthly operating reports on behalf of the Debtor, and he testified at the Debtor's initial and continued 341 meetings.  Either way, even if Mr. Levine is not considered to be current management of the Debtor, because Mr. Levine is the person who selected Mr. Granger to be employed as CEO and COO, Section 1104(e) applies.

As described above, the Debtor routinely and regularly took cash assets, in which it had no ownership interest, and used them for itself.  Even after retaining bankruptcy counsel, up to the day before the Petition Date, the Debtor continued to sign contracts to auction the valuable, personal possessions of others, knowing full well that it was going to use the Consignors' sales proceeds to pay its lenders, or to pay some other operating expense of the Debtor. The Debtor knew that by doing so, it might not have the funds available to pay the Consignors.  When Consignors inquired of the Debtor about their missing payments, the Debtor repeatedly put them off, promising the check would arrive in a few weeks, or that someone would check with the accountant, or the Debtor gave some other excuse.  Such deceptive conduct and knowing material misrepresentations made to induce others to use the Debtor's auction services present a textbook case of actual fraud and dishonesty.  Therefore, there are reasonable grounds to suspect that either current management, or the individual who selected current management of the Debtor, participated in fraud, dishonesty, or perhaps even criminal conduct, making the filing of a motion to appoint a trustee mandatory under Section 1104(e).

## III.    <u>LEGAL STANDARD FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE</u>

The Bankruptcy Code requires the appointment of a trustee to replace a debtor-in-possession if cause is shown.  Section 1104(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the

Case 2:19-bk-02843-SHG   Doc 132   Filed 06/12/19   Entered 06/12/19 15:34:40   Desc
Main Document    Page 9 of 39

United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case. . . ; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate. . . .

Either one of these two independent grounds is sufficient to justify the appointment of a Chapter 11 trustee. In re Lowenschuss, 171 F.3d 673, 685 (9th Cir. 1999). "The concepts of incompetence and dishonesty cover a wide spectrum of conduct and . . . the Court has broad discretion in applying such concepts to show cause." Schuster v. Dragone, 266 B.R. 268, 272 (Bankr. D. Conn. 2001). Diversion of estate funds constitutes fraud or dishonesty sufficient to warrant appointment of a trustee. In re Bibo, Inc., 76 F.3d 256, 257-58 (9th Cir. 1996) (appointment of a trustee was mandated where management had siphoned funds from the debtor through kickbacks). In Bibo, the Ninth Circuit affirmed the sua sponte appointment of a trustee to "prevent looting of the estate." 76 F.3d at 258. See also In re Colby Construction Corp., 51 B.R. 113, 117 (Bankr. S.D. N.Y. 1985) and In re La Sherene, 3 B.R. 169, 173-75 (Bankr. N.D. Ga. 1980)("Cause" exists where the owner is using debtor funds for personal use).

## IV.   EXAMPLES OF THE DEBTOR'S FRAUD

### A.   Theft of Over One Million Dollars from Its Consignor Clients.

As described above, the Debtor unlawfully took the Consignors' cash and used it for itself. The Debtor's theft of over $1 million from 363 Consignors constitutes fraud, dishonesty, incompetence, and gross mismanagement.

### B. **Missing Millions in Cash from the Year Preceding the Petition Date**

In the year preceding the Petition Date the Debtor took out over $2.7 million in loans.[10]

| Date of Loan | Lender | Amount | Reference |
|---|---|---|---|
| 3-26-18 | Second Wind Enterprises | $662,000 | Schedule D |
| 2018 (?) | Gary Robinson | $50,000 | p. 124 to 127 |
| 4-3-18 | Headway Capital | $20,000 | p. 75 & 76 |
| 4-25-18 | Sima Madison | $248,000 | Schedule E/F |
| 7-13-18 | Arcarius/Velocity Capital Group | $275,000 | pgs. 65 & 66 |
| 9-21-18 | Kalamata Capital Group / Kings Cash Group | $350,000 | p. 77 |
| 10-6-18 | Green Capital Funding | $200,000 | pgs. 72 & 73 |
| 10-17-18 | PayPal/Loan Builder – Swift Capital | $100,000 | p.84 |
| 10-23-18 | Kash Capital | $150,000 | p. 77 |
| 11-2-18 | Region Capital | $150,000 | Pgs. 84 & 85 |
| 11-26-18 | Kabbage | $100,000 | p.76 |
| 12-12-18 | Nawaz A. Quereshi & Kelly Lowery | $300,000 | Schedule D |
| Various dates | Gregg Granger (Debtor's CEO & COO) | $129,758[11] | Schedule E/F |
| | **Total** | **$2,734,758** | |

The Debtor's 2018 profit and loss statement shows that the Debtor incurred a net loss of $1,792.740 in 2018.  *See* **Exhibit F.**  However, the Profit and Loss statement does not include any of the cash proceeds from the $2,734,758 in loans that the Debtor received in 2018. Due to the $2.7

---

[10]  Because the Schedules just list the outstanding balance of the loans as of the Petition Date,  the UST used Mr. Levine's 341 meeting testimony to obtain the amount of the initial loan.  The page references are to the 341 meeting transcript, at **Exhibit A**. Otherwise, the amount of the outstanding balance as of the Petition Date, as listed in the Schedules, was used.

[11]  Mr. Granger's $129,758 at loan to the Debtor was not funded in cash.  Instead, it consists of a series of the Debtor's expenses that Mr. Granger paid directly on the Debtor's behalf.  Mr. Granger kept a log of these payments (attached at **Exhibit T**)  and these form the basis for his $129,758 loan.

million in loan proceeds, the Debtor still should have had enough cash to pay all of its expenses with about a million to spare.

The Debtor didn't use these loan proceeds to pay the expenses listed in the Profit & Loss statement, and when the Debtor filed bankruptcy less than three months later, the Debtor scheduled debts of over $5.6 million. There is no explanation given for what the Debtor did with all of its cash. However, it is clear that the cash was not used to pay Consignors or creditors. As an auction house that owns practically nothing (it leases its warehouse and its equipment), and doesn't buy inventory (the vast majority is acquired on consignment), how could the Debtor have used all of these funds? At the initial hearing in this case, the Debtor provided a vague rationale for its financial distress. It stated $275,000 was lost in a burglary and hundreds of thousands were spent to market and authenticate a Jackson Pollock painting. *See* **Exhibit K.** But even if those expenses were accurate, (and as set forth below, the UST submits that they are not), they still do not come close to explaining what the Debtor did with all of this cash that it borrowed within the 12 months prior to the Petition Date, and all of the cash it received from sales, but did not forward to Consignors.

The reason the Debtor has not answered these questions is because there are no good answers. There is no explanation for how this business legitimately used all of this cash in such a short period of time. Hence, there needs to be a forensic accounting in order to determine where this cash went, and if there is any way to recover it for the benefit of creditors. That being the case, even without a forensic accounting, the UST has uncovered a few instances where Mr. Levine has improperly taken cash from the Debtor and used it for his personal benefit.

C.    **Mr. Levine Improperly Used Debtor Assets for His Personal Benefit**

1.    **Mr. Levine Used Debtor Funds to Purchase a Scottsdale, AZ Residence**

In January of 2014, Josh Levine withdrew $68,000 from the Debtor's bank account in order to make a down payment on the purchase of a $680,000 residence located at 6101 E. Voltaire, in Scottsdale, Arizona (the "Scottsdale Residence").[12]  *See* **Exhibit G**.   Mr. Levine never repaid those funds to the Debtor.  When asked about the transaction at the Debtor's 1st 341 meeting, Mr. Levine confirmed that he took $68,000 from the business for the purchase of the residence, but testified that he "paid it back immediately" with funds from his 401(k) account.  The UST asked the Debtor to provide documentation to show that he repaid the $68,000 to the Debtor from his 401k account.  *See* pgs 160 – 163 of **Exhibit A.**  The documentation was never provided, and the UST again asked the Debtor about the $68,000 he withdrew from the Debtor in order to purchase the Scottsdale Residence at the continued 341 meeting on May 16, 2019.  However, this time, Mr. Levine gave a completely different answer and said he was incorrect about repaying the Debtor $68,000 from his 401k account.  Instead, Mr. Levine testified that prior to his withdrawal of the $68,000, the *Debtor* actually owed *Mr. Levine* $42,000, so in order to repay the $68,000, he "forgave that [$42,000] debt and then I gave the company $22,000 of inventory."[13]  *See* May 16, 2019 transcript, pgs 18 to 25, and 52 to 55, attached as **Exhibit H**.  Mr. Levine testified that the $42,000 loan he purportedly made to the Debtor was not documented with any sort of loan agreement or promissory note.  He could not recall the dates that he gave the Debtor these funds, and there were no repayment terms.  He testified, "[I]t wasn't handled like a loan.  It was my company. But the check, I mean she wrote

---

[12] Mr. Levine bought the Scottsdale Residence in his individual capacity.  Shortly thereafter, Mr. Levine transferred the Scottsdale Residence to another LLC that he owned ("Voltaire Shea LLC), and Voltaire Shea rented the Scottsdale Residence  to Shea Estates Assisted Living Center (an entity in which Mr. Levine owned 25%).

[13] Even if Mr. Levine's explanation was true (which the UST disputes), forgiveness of a $42,000 loan plus the $22,000 in inventory still leaves a $4,000 shortfall owed to the Debtor.

a check to buy the truck that went to the company. This was a sole-owned LLC."[14]  *See* **Exhibit H at p. 23.**  The UST requested Mr. Levine provide documentation that he provided a $42,000 loan to the Debtor, and that he gave $22,000 in inventory to the Debtor (the UST notes that this would still leave a $4,000 balance owed to the Debtor),  but to date, nothing has been provided. In sum, Mr. Levine took $68,000 in cash from the Debtor in order to make the down payment to purchase the Scottsdale Residence, and there is no documentation to support that he ever paid the Debtor back any of those funds.

    **2.**    **Mr. Levine Used Debtor Funds to Purchase an Allentown, PA Residence**

Between November of 2015 and October of 2017, Mr. Levine took $120,000 from the Debtor in order to purchase a residence in Allentown, PA (the "Allentown Residence").   Mr. Levine did this by directing the Debtor to issue regular bi-monthly paychecks to the owner of the Allentown Residence at a rate of $60,000 per year.  After the conclusion of the two year period, when the total of $120,000 had been paid, the owner of the Allentown Residence transferred the property to Mr. Levine via quit claim deed.  *See* transfer documents, attached hereto as **Exhibit Y.** When asked about the payments at the Debtor's 341 meeting, Mr. Levine testified as follows:

> **UST Counsel**:  Okay.  So she owned a house in Allentown, Pennsylvania and you paid her $120,000 over a period of two year from the company, correct?
>
> **Mr. Levine**:  Yes.
>
> **UST Counsel**:  After you finished making those payments she quitclaimed the house to you?
>
> **Mr. Levine**:  Correct

*See* p. 56 of **Exhibit H.**

---

[14] Mr. Levine asserted that his girlfriend wrote a check to buy a truck that was given to the company, and that was the basis for the $42,000 "loan."  However, UST counsel spoke to the girlfriend and she had no recollection of ever loaning the Debtor money for the purchase of a truck.

Mr. Levine claimed that the owner of the Allentown Residence was being paid because she was a "consultant" for the Debtor, and that is was described in a written agreement. However, he was unable to describe what consulting services she provided, or to whom she reported. See pgs 25 to 36 of **Exhibit H.** Further, Mr. Levine's *earlier testimony* that the owner of the Allentown Residence, who was previously in a personal relationship with Levine, *had stopped working for the Debtor in 2014 or 2015,* contradicted his claim that she was working as a consultant for the Debtor in 2016 and 2017.

> **UST Counsel:** Okay. So just I want to make sure we're as clear as possible on this. [The owner of the Allentown Residence] worked for the company until about three months prior to your breakup, and the breakup, as you recall, was when you moved out, and that was in 2014, or 2015, correct?

> **Mr. Levine**: Correct.

*See* pg. 33, lines 9 through 14, of **Exhibit H.** After the owner of the Allentown Residence stopped working for the Debtor, she moved out of state and had no communication with Mr. Levine but for the receipt of the regular, bi-monthly payments. There are no consulting contracts and no invoices submitted for services provided, just $120,000 in payments made from the Debtor's bank accounts, at the conclusion of which, she transferred the Allentown Residence to Mr. Levine. As such, any assertion that the $120,000 in payments between 2016 and 2017 were for her "consulting services" was simply untrue. Mr. Levine later admitted the $120,000 in payments were for the purchase of the Allentown Residence.

> **UST Counsel**: But you, but it was transferred to you after you paid her $120,000, correct?

> **Mr. Levine**: Yes. Essentially I bought the house twice.

*See* p. 55 of **Exhibit H.**

After Mr. Levine's testimony at the 2nd 341 meeting, the UST obtained a copy of the written agreement from the former owner of the Allentown Residence, Ms. Shana Weightnecht. The agreement is a personal property settlement agreement, which provides that Ms. Weighknecht shall

receive a salary and benefits from the Debtor, or from any "other entity owned by Josh, for a period of two (2) years . . . at an annual salary of $60,000. . ." .  Ms. Weighknecht wasn't actually performing any services for the Debtor, she was just being paid by the Debtor, *or by any "other entity owned by Josh*."  *See* a copy of the agreement, attached as **Exhibit I.**  It did not matter what entity it was, because she was not actually going to be performing any services for it.  The point of the agreement was for Ms. Weighknecht to receive $120,000, and after those payments were made, she was obligated to "execute the Quit Claim Deed thereby transferring full title, ownership and interest in the Allentown, Pennsylvania property, including all of the household furniture, furnishings and other contents therein, to Josh without any further offset or other consideration." *See* **Exhibit 1**.  The payments disguised as "salary" were a sham, and Ms. Weighknecht was used as a pawn in Mr. Levine's scheme to withdraw these funds from the company.  Calling the payments "salary" was simply a way for Mr. Levine to withdraw $120,000 in funds from the Debtor for his personal benefit, in order to purchase the Allentown Residence.  *See* pgs 25 to 36 and 52 to 58 of **Exhibit H.**  Notably, just six months after receiving title to the Allentown Residence, Mr. Levine put it on the market and sold it for $130,000, thereby effectively cashing out the full $120,000 he withdrew from the Debtor.  *See* **Exhibit J**.

        **3.**       **Mr. Levine Transferred the Rights to the Jackson Pollock Commission from the Debtor to Himself.**

At the first hearing in this case, Debtor's counsel described a series of unfortunate events that caused the Debtor's financial difficulties.  One of those events related to a Jackson Pollock painting that had been consigned to the Debtor to sell.  Debtor's counsel represented that the Debtor,

> [S]pent hundreds of thousands of dollars dedicated to the authentication and marketing of a Jackson Pollock painting, which is still out there, and if the provenance is ever established, could sell and result in a large payment to the Debtor, but as of yet, no money has been received in exchange for those expenditures.

*See* March 20, 2019, unofficial partial transcript, attached as **Exhibit K.** The meaning of those statements was clear: (1) the Debtor had spent hundreds of thousands of dollars to get the painting ready for auction; (2) the Debtor had not yet received any money in return; and (3) the Debtor could still realize a substantial payment if only the provenance of the painting could be established. However, none of those three statements were true.

First, the Debtor was unable to substantiate his claim that he spent "hundreds of thousands of dollars" on the authentication and marketing of the painting. The Debtor provided a list of all such expenses (without any supporting documentation), attached hereto as **Exhibit L**. In this list, the Debtor included salary expenses for Josh Levine and the Debtor's marketing department, which is inappropriate, because those salary and payroll expenses would have been paid as a part of the Debtor's regular operations, with or without the Pollock painting. Once those two line items, along with an undated $2,000 expense for "Legal Fees Est" were removed, the total expenses attributed to the painting were just $67,901. This is vastly different than the "hundreds of thousands of dollars" amount that was represented in Court, and certainly not enough to put the Debtor in a financial tailspin.

Second, contrary to the representation that "no money has been received in exchange for those expenditures," the Debtor had already brokered a sale of the Pollock painting and had already received a $75,000 commission. Although the Debtor initially marketed an auction of the painting to take place in June of 2017 (with bidding to commence at $5 million), on the day of the auction, with a room full of potential bidders, Mr. Levine stepped up to the podium and cancelled it. The auction never took place. *See* **Exhibit Z**. But just 9 days later, on June 29, 2017, the Debtor entered into the first of a series of contracts related to the Pollock painting, which, *inter alia*, sold the painting and transferred rights to any future commission from the Debtor to Josh Levine. *See*

Pollack contracts, attached as **Exhibit M.**[15]  Specifically, in an undisclosed, private sale, without any of the fanfare or publicity of the initially scheduled auction, the Debtor brokered the painting for a substantially reduced price of $375,000.  Contrary to the Debtor's representation that the Debtor had not yet received any funds for the painting, the Debtor received a commission check of $75,000. *See* copy of Debtor invoice for sale price and commission, attached as **Exhibit N.**

Finally, despite Debtor's representations to this Court of a future big payday for the Debtor if the provenance was established and the painting sold, while *the Debtor* was not entitled to any further commission if the painting was sold in the future, that was not the case for *Mr. Levine*.  Mr. Levine had quietly negotiated a private side deal with the purchaser of the painting, whereby, if the purchaser of the painting was to re-sell it, *Mr. Levine, in his individual capacity, and not the Debtor*, would receive a 15% commission on the sales price.  *See* "*Agreement Regarding Ownership and Sale of Painting*," included at pg. 5, ¶ 2, of **Exhibit M.**   All of the prior contracts regarding this painting clearly and unambiguously indicated that the Debtor was entitled to the commission.  Now, for no reason, Mr. Levine has replaced the Debtor in the contract as the party entitled to the commission.  This painting was arguably the most valuable asset that the Debtor had ever had the opportunity to sell, and less than a year before it filed bankruptcy, the Debtor sold it in a private, undisclosed transaction for a fraction of the anticipated price, and Josh Levine negotiated a side deal to receive a 15% commission in his individual capacity  if the painting is ever re-sold.  Not only did the Debtor misrepresent the facts to this court, but Mr. Levine also took what could have been a very profitable commission away from the Debtor, in order to line his own pockets with a commission.

---

[15] One such Pollack contract, the "*Agreement for the Option to Purchase a Painting*," that is referenced in the "*Agreement Regarding Ownership and Sale of Painting*" was requested by the UST, but it was never provided.  Despite being a party to the agreement, the Debtor asserted that it did not have a copy of the agreement.

### 4.    Personal Credit Cards and In-Person Cash Bank Withdrawals

In the Debtor's response to Question No. 3 on the Statement of Financial Affairs (the "SOFA"), the Debtor included a list of all of the Debtor's payments and withdrawals for the 90 day period preceding the Petition Date.   Embedded in this list are several questionable items.  For example, there are several payments to credit card companies for Mr. Levine's personal credit card accounts, such as Discover card and Barclay Bank.[16]  In addition, there were significant "in-branch cash withdrawals," for which no business purpose or creditor is identified.  The dates and amounts of these cash withdrawals, which total over $200,000, are listed below:

| Date | Amount |
|------|--------|
| 12-28-2018 | $31,925.15 |
| 1-18-2019 | $7,422.70 |
| 2-15-2019 | $14,604.05 |
| 2-15-2019 | $54,378.59 |
| 2-28-2019 | $5,000.00 |
| 2-28-2019 | $6,473.90 |
| 3-1-2019 | $57,718.44 |
| 3-5-2019 | $12,464 |
| 3-6-2019 | $11,290 |
| **Total** | **$201,276.83** |

The failure to identify the purpose and recipient of these funds, when this information is clearly required on the SOFA, along with the timing of these withdrawals so close to the Petition Date, makes them suspect as withdrawals for an inappropriate purpose.  More information is needed to find out why these funds were withdrawn and how they were used.

### 5.    Debtor Loan Proceeds May Have Been Deposited into Mr. Levine's Personal Bank Accounts

---

[16] In an attempt to discharge personal obligations, Mr. Levine also listed some of his personal credit card accounts in the Debtor's Schedule F.  After questioning at the 341 meeting about these personal accounts, the Debtor removed two such accounts (Chase Freedom and one of the Wells Fargo accounts) from the amended schedules.

One of the creditors in the case is an individual named Sima Madison. The Debtor's schedules reflect that she is owed $248,000 for a loan, and $135,800.70 as a Consignor. When the UST asked the Debtor to provide documentation to support the $248,000 loan, the Debtor provided a p-note evidencing a loan from Ms. Madison to the Debtor, in addition to what appears to be copies of the check carbon paper that some people use in their checkbooks, for five checks in varying amounts that total $253,000. See copies attached as **Exhibit Z1**. The problem is, all of the copies reflect checks that are made payable to Mr. Josh Levine, in his individual capacity, as opposed to being payable to the Debtor. If Mr. Levine deposited these checks into his personal bank account, but then listed the debt as an obligation of the Debtor, that is no different than Mr. Levine inappropriately taking money directly from the Debtor and depositing it into his personal bank account. The UST has requested the Debtor provide copies of the bank statements to show these checks were deposited into the Debtor's bank account, but they have not yet been provided.

6.    **Allegations that Mr. Levine Takes Property Owned by the Debtor and Sells it as His Own**

In addition to their salaries and commissions, Mr. Levine receives income from the Debtor from personal consignment sales, where he is selling his own personal property through the Debtor, just like a regular consignor. There have been concerns expressed to the UST's office that Mr. Levine may be consigning property as if it were his own, when it is actually property owned by the Debtor.[17] In an attempt to investigate this further, the UST has asked Mr. Levine to provide separate lists of all of the items he and Mr. Granger have personally consigned through the Debtor for the past four years, but it has not yet been provided. See pgs. 110 to 121 of **Exhibit H.**

In the original SOFA that was filed with the Court, a schedule included "consignor numbers" next to the names of various consignors. This document listed the consignor

---

[17] Specific questions have been raised about Debtor owned inventory, which are items the Debtor acquires through customer credit card "charge-backs," after the consignor has already been paid and the auction closed. There are certain of these items that were believed to be owned by the Debtor, but have been seen popping up recently for auction with no consignor number; such as the Bernard Buffet still life oil that sold for $1,250 on May 5, 2019, but was believed to have been acquired by the Debtor on July 30, 2015; and a Christian Wilhelm Ernst Dietrich oil painting that sold for $1,050 on May 5, 2019, but was believed to have been in the Debtor's possession since 2015.

identification number "G1" next to the name Josh Levine.  *See*  docket no. 49, p. 100, attached at

**Exhibit O.**  A search on the Debtor's website for items consigned with the "G1" reference code

reveals a large amount of gold and silver bullion, gold and silver bars, and gold and silver coins that

were sold at the October 7, October 14, and October 21, 2018 auctions, for roughly $93,000.  *See*

**Exhibit P** for printouts of a two of the items that were sold at these auctions.  Upon examination,

Mr. Levine testified that, despite the "G1" consignor code being listed next to his name,  the "G1"

code did not identify him personally, but that it identified an asset owned by the Debtor. He further

testified that the Debtor, just five months before it filed bankruptcy, at a time when it was in such

financial distress that didn't have the funds to pay Consignors and was allegedly taking out loans to

make payroll, bought roughly $100,000 of gold as a "business idea."  *See*  pgs. 118 to 121 of

**Exhibit H.**   Buying massive amounts of gold and silver when the Debtor is in financial distress

and unable to pay its consignors and employees seems like a questionable business idea at best.  But

moreover, it calls into question the blurry line between the Debtor's assets and the assets owned

personally by Mr. John Levine, in a business that sells personal property at auction every weekend.

Given that the Debtor has not provided any information or a clear explanation of these gold and

silver sales, these matters need to be investigated further to ensure that those in charge of the Debtor

were not siphoning assets away at the expense of its creditors.

**V.**     **EXAMPLES OF THE DEBTOR'S INCOMPETENCE**
    **& GROSS MISMANGEMENT**

   **A.**     **The Debtor's Deepening Post-Petition Insolvency**

        The Debtor attached a budget to its cash collateral motion that was approved by the Court

on March 26, 2019 (the "Budget").  *See* docket no. 10, and **Exhibit D**.   The Budget showed the

Debtor's projected income and expenses in 4 week increments for the first 12 weeks of the case.

Even if everything went exactly as the Debtor projected, the Debtor was projecting a thin profit

with little net income available to repay its creditors. We now have the actual results of the Debtor's

operations for the first two 4 week periods of the case, and the numbers show that the Debtor's revenue is less than half of what it projected in the Budget. As a result, it is accruing expenses and increasing post-petition losses. Copies of the Debtor's Budget to Actual Reports for the first two 4 week periods in the case are attached as **Exhibit Q.**

For the first four week period ending April 12, 2019, the Debtor projected revenue of $378,000, but reported actual revenue that was less than half of that, of just $157,531.77. The Debtor reported net income of $26,091, but that "profit" was on paper only, because it didn't account for over $42,800 in budgeted expenses that weren't paid, such as $11,850 for rent;[18] $9,450 for sales commissions to its employees; $5,000 for medical insurance for its employees; $2,000 for advertising; and $1,809 for Fords BMW lease. If these, and the other budgeted expenses were actually paid, the Debtor would have had a loss of over $16,000 in the first month of the case.

Similarly, in the second four week period ending May 10, 2019, the Debtor projected revenue of $381,600, but actual revenue was less than half of that, of just $184,116. The Debtor reported a net loss for this period of -$944, but again, this didn't account for approximately $36,900 in budgeted expenses that weren't paid, such as: $3,570 for auto insurance; $9,726 for employee medical insurance; $5,000 for legal fees; $3,050 in rent, $1,474 for advertising; $1,110 for an office equipment lease; $1,279 for telephone; $720 for worker's compensation insurance; and $750 for internet. If these, and the other budgeted expenses were actually paid, the Debtor would have had a loss of $37,844 for the second month of the case.

Bankruptcy cases abound which recognize the principle that under Section 1104(a)(1), "gross mismanagement" includes the chronic failure to pay post-petition obligations. In re Euro-Am. Lodging Corp., 365 B.R. 421, 426 (Bankr. S.D. N.Y. 2007). Companies operating with the

[18] Rent for the building is approximately $30,000/month, but in December of 2018 Debtor signed a forbearance agreement that temporarily reduced the monthly payment to $11,850/month for 12 months.

protection of the Bankruptcy Court are expected to stay current on their operating expenses because it would be manifestly unfair to prevent creditors from taking any collection action, while a company operating in Chapter 11 continues to sink deeper into insolvency.

Particularly troubling is the Debtor's failure to pay the health insurance premiums for its employees. Because the Debtor withholds 50% of the monthly health insurance premium from the employees' paychecks, but isn't actually paying the premium, the Debtor is *using its employees' wages to pay other operating expenses.*[19]

Ultimately, the Debtor's insolvency appears to be deepening while it is operating as a Chapter 11 debtor-in-possession. These rapidly accruing post-petition administrative expenses are detrimental to all other creditors, and provide no benefit to anyone, except, perhaps, to any highly compensated employees of the Debtor who continue to draw exorbitant wages.

### B. The Debtor is Paying an Exorbitant Salary to Mr. Levine's Childhood Friend and Current CEO/COO - Mr. Gregg Granger

In January of 2018, the Debtor engaged Mr. Gregg Granger to act as a consultant for the Debtor because, as Mr. Levine put it, "I needed someone to come in and run the company and try to right the ship." *See* **Exhibit H, p. 94.** Mr. Granger and Mr. Levine first met as children riding bikes back in Pennsylvania and have been friends since that time. *See* **Exhibit H, p. 94**. Mr. Granger's permanent residence is in Florida, where for the past 10 years he has owned and operated an LLC called "Wildlife Ranger." Wildlife Ranger is a business that will remove nuisance wildlife (such as rodents, snakes, etc.) from property. *See* 2019 Wildlife Ranger Annual Report & LinkedIn

---

[19] The Debtor's health insurance provider, United Healthcare, filed a proof of claim asserting a pre-petition claim for $5,050.08. Again, this is troubling because the Debtor withheld funds from its employee's paychecks in order to pay this premium, *and* obtained a Court Order authorizing it to pay these pre-petition health insurance premiums. *See* docket nos. 11 and 42.

documents at **Exhibit R.**    Upon information and belief, prior to working as a consultant for the Debtor, Mr. Granger did not have any experience working in the auction house industry, nor did he have any specialized auction house education or certifications. *See* **Exhibit H, p. 97 - 98**.

Despite Mr. Granger's lack of experience, Mr. Levine hired Mr. Granger as a consultant for the Debtor at a rate of $14,000 per month ($168,000/year).  *See* **Exhibit A,** p. 100.  This engagement is troubling not just because of Mr. Granger's inexperience in the industry, or because it seems excessive for the size of the company and the nature of services being provided, but also because the Debtor did not then, and does not now, have adequate funds to pay Mr. Granger this level of compensation.  However, Mr. Levine did not let the absence of cash stop him from engaging his childhood friend as a consultant, so he arranged for the Debtor to use credit cards to pay Mr. Granger's monthly consulting fees.  Specifically, in yet another display of gross mismanagement, Mr. Levine paid Mr. Granger's consulting fee every month on a credit card processed through Mr. Granger's Wildlife Ranger merchant account.  *See* Wildlife Ranger bank statements which show monthly credit card deposits, attached as **Exhibit S.**    Once the charges were processed by the credit card company, they would be deposited into Mr. Granger's Wildlife Ranger bank account at Regions Bank in Florida.  *See* **Exhibit H**, p. 81 to 92.

It was very expensive for the Debtor to pay Mr. Granger's salary with a credit card.  Each time it processed a payment, there were attendant merchant processing fees of around 2%,  plus monthly interest charges, and of course, minimum monthly payments. At least three times, perhaps because the Debtor had exceeded its credit limit on all of its credit cards, Mr. Granger used *his own* personal credit cards to pay his consulting fees.  Specifically, in July, August, and September, Mr. Granger used a Bank of America credit card, a Citi AAdvantge credit card, and a Citi Thank you Preferred credit card, issued in Mr. Granger's own name, to charge his consulting fees to Wildlife Ranger, and have the funds deposited there for his use.  Mr. Granger kept records of the merchant

processing fees, the monthly minimum payments, the monthly interest, and the consulting fees, and has added them all up and asserted they were "loans" he provided to the Debtor. *See* the list of fees & expenses supporting the $129,677 loan, created and provided by Mr. Granger, attached as **Exhibit T**. The Debtor agrees with Mr. Granger's calculation of these "loans" and has scheduled the total amount, $129,677, as an undisputed debt owed to Mr. Granger. *See* docket no. 106, p. 24.

On the Petition Date, Mr. Granger switched from a "consultant" and became an "employee" of the Debtor. *See* pgs. 93- 94 of **Exhibit A**.[20] He was given the title of CEO / COO, and was given a raise to $14,500 per month ($174,000). Although Mr. Granger may be working very hard for the Debtor, he has no specialized experience in running an auction house or turning around distressed companies. Further, the Debtor's post-petition payment of Mr. Granger's $14,500 per month salary is at the direct expense of the Consignor victims in this case. As described above, the Debtor's monthly revenues are less than half of what they were projected to be in the cash collateral budget, and they are less than 20% of what the Debtors' average monthly revenues were pre-petition. Simply put, the Debtor didn't have the money to pay Mr. Granger the $14,000 consultant fee pre-petition, and it certainly doesn't have the funds to pay Mr. Granger the $14,500 wages now. Given Mr. Granger's long term friendship with Mr. Levine, combined with Mr. Granger's lack of experience in this industry, there is ample basis to presume that this is simply a sweetheart deal between two old friends, enabling them to squeeze more money out of the Debtor for personal use. It was, and is, gross mismanagement for the Debtor to pay Mr. Granger a salary that the Debtor clearly cannot afford.

---

[20] Mr. Levine's 341 meeting testimony regarding the date Mr. Granger became an employee contradicted the information in the Debtor's motion to pay employees pre-petition wages. The wages motion asserted that Mr. Granger was an "employee" pre-petition. See docket nos. 11 & 14. However, Mr. Levine testified that Mr. Granger was an independent contractor pre-petition who didn't become an employee until the Petition Date. As an independent contractor, Mr. Granger was not entitled to pre-petition wages, and they should not have been sought for Mr. Granger in the Employee Wages Motion.

C. **The Debtor Made over $20,000 in Preferential Payments to Mr. Greg Granger**

As stated above, the Debtor listed a $129,677 unsecured loan owed to Mr. Greg Granger (the "Granger Loan") in its Schedule F filed with the Court. Within the five months prior to the Debtor's Petition Date, while Mr. Granger was an insider working full time as a management consultant for the Debtor, and while he was making decisions about what payments to make with the Debtor's limited resources, the Debtor made at least $20,900 in preferential payments to Mr. Granger. This reduced the outstanding balance of the Granger Loan to the detriment of all other creditors. The following payments were made:

| Date | Amount | Type |
|------|--------|------|
| March 14, 2019 | $2,000 | Cash |
| March 11, 2019 | $700 | Cash |
| March 5, 2019 | $500 | Cash |
| February 26, 2019 | $3,200 | Cash |
| February 16, 2019 | $2,500 | Cashier's Check |
| February 14, 2019 | $1,500 | Cash |
| February 5, 2019 | $2,000 | Cash |
| January 31, 2019 | $2,000 | Cash |
| January 24, 2019 | $4,000 | Unknown |
| January 18, 2019 | $1,000 | Unknown |
| October 10, 2018 | $1,500 | Unknown |
| **Total** | **$20,900.00** | |

*See* Docket No. 107, p. 3. In what is a breach of its fiduciary duty to all creditors, the Debtor does not appear to have any intention of recovering these preferential payments from Mr. Granger on behalf of the estate. As long as Mr. Granger is acting as the Debtor's CEO/COO, it is unlikely that this will change.

**D.** **Discrepancies in the Amount of Compensation the Debtor Paid to Mr. Granger**

Question no. 30 of the SOFA requires the Debtor to list "payments, distributions, or withdrawals credited or given to insiders" within 1 year before the petition date.[21] In the Debtor's first SOFA, filed with the Court on April 15, 2019, the Debtor listed $89,000 of consulting fees paid to Mr. Granger. *See* docket no. 76, p. 9. In amended SOFAs, the Debtor reduced this amount to just $57,000 of consulting fees paid to Mr. Granger. *See* docket no. 83, p. 9, and docket no. 107, p. 9.

However, according to Mr. Granger's records, he received compensation of $114,000 in the year preceding the Petition Date, twice as much as the $57,000 that was reported by the Debtor. Mr. Granger provided a list of all such payments and copies of the statements from his Wildlife Ranger bank account. As set forth in the comparison table below, the payments reported by the Debtor in the SOFA, and the payments that the Debtor received in his bank account, don't match up.[22]

---

[21] Although the instructions on the form direct the Debtor to disclose "value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised," the Debtor makes it clear that it is only listing "compensation" to Mr. Granger under question no. 30, because it discloses all loan repayments and sales proceeds for consigned goods under Question no. 4.

[22] It is clear that the payments the Debtor received in his Wildlife Ranger bank account were for Mr. Granger's compensation, because Mr. Granger charged the Debtor the associated merchant processing fees for each deposit and added such fees to the balance of the loan that the Debtor owed to him. Furthermore, we know these deposits weren't loan repayments to Mr. Granger, because the $20,900 in loan repayments were separately itemized under SOFA question no. 4, and were for different amounts on different dates.

| Mr. Granger's Itemized Compensation as Disclosed in the SOFA | | Mr. Granger's compensation as Disclosed in his bank statements | |
|---|---|---|---|
| April 6, 2018 | $2,500 | April 6, 2018 | $2,500 |
| April 6, 2018 | $3,000 | April 6, 2018 | $3,000 |
| April 6, 2018 | $4,500 | April 6, 2018 | $4,500 |
| May 14, 2018 | $12,000 | May 14, 2018 | $12,000 |
| | | June 8, 2018 | $12,000 |
| | | July 2, 2018 | $13,500 |
| | | August 3, 2019 | $13,500 |
| | | September 4, 2019 | $5,500 |
| | | September 5, 2019 | $8,000 |
| October 1, 2018 | $13,500 | | |
| | | October 3, 2018 | $15,000 |
| | | November 5, 2018 | $13,500 |
| November 12, 2018 | $13,500 | | |
| December 5, 2018 | $8,500 | | |
| | | December 6, 2018 | $1,500 |
| | | December 6, 2018 | $7,000 |
| | | January 3, 2019 | $500 |
| | | January 3, 2019 | $750 |
| | | January 4, 2019 | $500 |
| | | January 7, 2019 | $250 |
| | | January 10, 2019 | $500 |
| **Total** | **$57,500** | **Total** | **$114,000** |

The fact that the Debtor listed only $57,500 as compensation paid to Mr. Granger, while Mr. Granger's bank account shows consulting fees of $114,000, is symptomatic of the problem that exists within the Debtor's financial records. Under normal circumstances, for most businesses, adding up the amount of compensation paid to a consultant in the year preceding the Petition Date would be a very simple, non-controversial task. The fact that the Debtor's itemization in the SOFA, that it filed with the Court under penalty of perjury, differs so drastically from the information in the documents that were provided by Mr. Granger, suggests that the Debtor's financial records are, at best, wholly unreliable.

### E. **The Debtor Has Been Operating Illegally Without an Auction House License**

The City of Phoenix requires all auction houses to be licensed. The Debtor previously had a license to operate an auction house, but it expired on December 31, 2018, three months prior to the Petition Date. *See* copy of expired Auction House license, attached as **Exhibit U.** The Debtor applied for a new auction house license on April 17, 2019, but upon information and belief, the new license application requires the Debtor to undergo a background check, and it has not been approved by the City. According to Section 19-3 of the Regulations for Auctioneer, Auction House, Scrap Metal Dealer & Secondhand Dealer, "it is unlawful for any person to operate a business that has been licensed pursuant to this Chapter while the license for that business is suspended, revoked or expired." The UST has repeatedly asked the Debtor for a copy of its new license, only to have the Debtor send a copy of the former, expired license, or to be told that the Debtor doesn't have it in "hard copy" with which to provide to us. The UST has inquired of the City of Phoenix, and has learned that as of June 3, 2019, the Debtor has not been granted a license to operate as an auction house. As such, the Debtor has been operating illegally without a license for the past 6 months, since January 1, 2019.

### F. **The Debtor's SOFA, Schedules & MML are Incomplete and Inaccurate**

In the two months that have passed since the date the Debtor filed its initial SOFA and Schedules, the Debtor has amended its documents no less than six times. And yet, as of the most recent, May 14, 2019, amendment to the Schedules, the documents still are not complete.

#### 1. **The Debtor Must List the Date Consignors' Claims Were Incurred**

The vast majority of creditors in the case (363 of the 400) are Consignors. On Schedule F, the Debtor is required to list the date each debt to a Consignor was incurred. This is important information, particularly to the Consignors, because it gives context and a timeframe to the historical financial picture of the Debtor as it relates to their claims. At the initial 341 meeting of

creditors, undersigned counsel asked Mr. Levine about these omissions, and was told that the

information would be amended.

> **UST counsel**:  On the schedules, there are several creditors listed
> without the dates listed that the debt was incurred.  That needs to be
> included on an amendment.

> **Debtor's counsel**:  To the extent the Debtor has those dates we will
> make sure they're included in the schedules.

> **UST counsel**:  Do you have the dates that the creditors incurred these
> debts for consignment contracts?

> **Mr. Levine**:  It should be in Quickbooks, the date it was entered,
> correct.  Yes.

> **UST counsel**:  Okay.

> **Mr. Levine:**  I believe we can get that fairly easily.

> **UST counsel**:  Thank you.

*See* 1st Transcript, pgs 101 to 102, at **Exhibit A.**   After the April 16, 2019, 341 meeting, the Debtor

filed two successive amendments to the Schedules, but neither one contained the requisite

information.

On May 16, 2019, at the Debtor's continued 341 meeting, the Debtor was again asked about

these omissions, and was told, again, that the Schedules would be amended.

> **UST counsel**:  When you list a consignment creditor how do you
> determine the amount of their claim?

> **Mr. Levine**:  Their - - it was their gross proceeds less our
> commission.

> **UST Counsel**:  Okay.  So for each of these consignment creditors it's
> accurate to say that they consigned their personal property to the
> Debtor?

> **Mr. Levine**:  Yes.

> **UST Counsel**:  Correct?  And the Debtor sold their personal
> property?

> **Mr. Levine**:  Yes.

1
2

**UST Counsel**:  And the Debtor collected sales proceeds for that personal property?

**Mr. Levine**:  Yes.

3
4

**UST Counsel**:  And then the Debtor took its commission from those sales proceeds?

5

**Mr. Levine**:  Yes.

6
7

**UST Counsel**:  Okay.  But then the amount that's listed is the amount that the Debtor did not pay to the consignment creditor?

8

**Mr. Levine**:  You're absolutely correct.

9
10

**UST Counsel**:  Okay.  And when you were determining the amount that was owed to each consignment creditor what document do you look at to see the amount that they're owed?

11

**Mr. Levine**:  It's called the CO.  It's the consignment order.

12

**UST Counsel**:  Does that consignment order have the date of the sale?

13
14

**Mr. Levine**:  Yes.

15
16
17

**UST Counsel**:  Okay.  That's one of the items that we discussed at the last 341 meeting is including the date that this consignment - - that each consignment creditor's claim was incurred.  So you filed two amended schedules since our last meeting of creditors, but neither of them include the date of the - - that the claim was incurred.  Why is that?

18
19

**Mr. Levine**:  I thought we provided a spreadsheet from QuickBooks that shows the date it was entered, which would have been the date the sale closed.

20
21
22
23

**UST Counsel**:  Okay.  What you need to do is include, you see on the form here where it says, date debt was incurred, and it's under every single creditor, that information is required to be provided, okay?  And it's not just provided to our office.  I don't know if we've received that.  I don't recall seeing it.  But it needs to be included on the schedules.

24

**Mr. Levine**:  I believe the only way it was sent was 30, 60, 90, so I understand.

25
26

**UST Counsel**:  Okay.  Yeah, so we need to know the date that each creditors' claim was incurred.  Can you prepare that amendment and file it with the Court?

27

**Debtor's Counsel**:  Yes Ma'am.

28

**Mr. Levine**:  Yes.

*See* **Exhibit H**, pgs. 9 – 11. To date, almost four weeks after this exchange, no amendment has been filed.

### 2. The Debtor Excluded 95% of the Consignors from the MML

Bankruptcy Rule 1007 requires the Debtor to file a Master Mailing List ("MML") containing the name and address of every creditor in the case on the Petition Date. The MML is important because it is what the Clerk of the Court uses in order to send out the official Notice of Bankruptcy and the Notice of 341 Meeting to all creditors. In most cases, those Notices are the only way creditors find out that a bankruptcy case has been filed in which they are a creditor.

In this case, even though the Debtor has 363 Consignors who are owed their sales proceeds, the Debtor filed an MML with *only 17 Consignors* on it. *See* docket no. 4. Three hundred and forty-six (346) Consignors were excluded from the MML, and as a result, they did not receive the Notice of Bankruptcy or Notice of the 341 meeting. On April 2, 2019, the UST brought this omission to the Court's attention, and the Debtor, claiming it was an oversight, promised to file an amended list, which it did on April 4, 2019.[23] But still, the question remains as to how the Debtor could have legitimately omitted 346 Consignors from the MML? The Debtor was required to sign the Master Mailing List under penalty of perjury and attest to its accuracy. The omission of 346 Consignors from that initial list should have been fairly obvious to Mr. Levine. Yet, Mr. Levine attested under penalty of perjury that the blatantly inaccurate list was true and correct. That was either grossly incompetent, or a misguided attempt to minimize Consignor awareness of the Debtor's bankruptcy filing.

---

[23] Due to the Debtor's failure to include 346 of the Debtor's 363 Consignors on the first Master Mailing List, these Consignors did not receive the requisite, statutory notice of the April 16, 2019, 341 meeting, and the UST was required to conduct a second 341 meeting on May 16, 2019.

Throughout the course of this case, the Debtor has repeatedly emphasized how "consignor confidence" was critical to the Debtor's success. Perhaps the Debtor thought that the confidence of Consignors would be shaken if they found out about the Debtor's dire financial condition in this bankruptcy case. Either way, whether it was unintentional or deliberate, the failure of the Debtor to include 95% of the Consignors who are owed sales proceeds on the initial MML demonstrates incompetence and gross mismanagement.

## VI.     EXAMPLES OF THE DEBTOR'S DISHONESTY

While there is a theme of dishonesty that is pervasive throughout many of the examples described above, there are additional discrete examples, set forth below, that should not go without mention.

### A.     The Debtor Made False Representations about Making Charitable Donations

**OCJ Kids.** On December 13, 2018, Mr. Levine posted a video on his Facebook page promoting an auction he called the "Gift of Love" Christmas auction. In the video, Mr. Levine explains how all of the proceeds from the auction will be donated to an organization called OCJ Kids, which helps foster children. Mr. Levine also posted pictures and a description of the auction in a second Facebook post. According to the Debtor's website, the auction closed and had total sales of $13,730. *See* **Exhibit X** for the auction sales totals, the Facebook post, and two posted items from the auction. Undersigned counsel spoke with the President of OCJ Kids and confirmed that OCJ Kids never received any donations that the Debtor was promoting from this auction. In fact, OCJ Kids wasn't even aware that the Debtor was promoting a charity auction that was intended to benefit their organization. When asked about the OCJ Kids' auction proceeds at the continued 341 meeting, Mr. Levine testified that, contrary to what he asserted in his video and on his Facebook posts, the proceeds from this auction were actually to be provided to a consignor (Sima Madison), and that she was to donate the sales proceeds for a tax write-off. However,

because the Debtor never provided the auction sales proceeds to Ms. Madison, she was unable to make the donation.  *See* pgs 27 to 30 of **Exhibit H.**

       **St. Jude's Children's Research Hospital.**  The Debtor's website includes a picture of Mr. Levine holding a giant, poster-board sized $2,500 check dated November 11, 2018, along with an accompanying press release describing a $2,500 donation that the Debtor allegedly made to St. Jude's Children's Research Hospital.  See **Exhibit W**.  Despite repeated requests by the UST for a copy of the cancelled check from the Debtor to St. Jude's, it hasn't been produced, thus again raising questions as to the Debtor's credibility.

B.    **The Debtor Made False Representations about the Amount of Payments It Made to Consignors After the Burglary**

    The Debtor represented at the beginning of this case that one of the "economic misfortunes" that led to the Debtor's bankruptcy was a burglary where the Debtor was robbed of $275,000 of consigned goods.  *See* **Exhibit K**.  When Mr. Levine was asked at his 341 meeting about the $275,000 loss, Mr. Levine testified that, "Yeah, we had to pay [the Consignors] for it." *See* **Exhibit A**, p. 43.  When asked how much the Debtor had to pay, Mr. Levine testified, "Close to $275,000."  *See* **Exhibit A**, p. 45. However, when the UST asked the Debtor to provide documentation to support the $275,000 in payments to Consignors whose items were stolen, the Debtor was only able to come up with a list of $27,000 that it paid to Consignors. See **Exhibit V.** At the continued meeting of creditors, the UST asked Mr. Levine to confirm that these were all of the payments the Debtor made to Consignors as a result of the burglary.

**Hearing Officer:**  And is that it?  Those are all of the payments that you made to - -

**Mr. Levine**: To consigners, correct.

**Hearing Officer:**  Did you make any other payments to anyone?

**Mr. Levine:**  No.

*See* **Exhibit H** p.106.  This $27,000 is vastly different from the $275,000 he represented to the Court and under oath at the initial 341 meeting.

### C.    Mr. Levine Misrepresents His Education on the Debtor's Website

On the J. Levine Auction & Appraisals website, under the section describing "Our Company," and "The Owner," Mr. Levine represents, "[H]is interest grew and he armed himself with degrees in Accounting, Business Management and an Auctioneer Certification from the Pennsylvania State program over 20 years ago."  *See* **Exhibit B**.  The reality is, Mr. Levine does not have a degree in Accounting from the "Pennsylvania State" program, or from anywhere else. Instead, at the Debtor's 341 meeting Mr. Levine testified that he obtained an auctioneer's license from Reading Area Community College, and that he took business management classes at Allentown Business School (which no longer exists).  *See* **Exhibit A,** pgs. 5 – 7.   Although this misrepresentation about his educational background from over 20 years ago may seem like an innocuous matter of little importance, it does raise questions regarding Mr. Levine's veracity in other business related matters. As set forth above, this case is replete with examples of the Debtor's dishonesty.

## VII.    CONCLUSION

Both the US Supreme Court and the Ninth Circuit have held that the purpose of bankruptcy is to help the honest but unfortunate debtor obtain a fresh start, while the dishonest debtor is not to benefit from his wrongdoing.  *See Grogan v. Garner*, 498 U.S. 279 (1991);  *In re Sicroff*, 401 F.3d 1101 (9th Cir. 2005) and *In re Kirsh*, 973 F.2d 1454 (9th Cir. 1992).   The Debtor in this case is not an "honest but unfortunate" debtor.  The Debtor is trying to disguise its theft of sales proceeds, assets which the Debtor never owned and was not entitled to use, as unfortunate but well intentioned pre-petition business decisions.  Although there is no doubt that the Debtor made bad business decisions, it does not change the fact that the Debtor routinely and wrongfully converted

the cash sales proceeds that Consignors entrusted to it.  These funds were placed in the Debtor's possession for a limited term, but the Debtor abused its access and stole the Consignors' money.  It was a scam, and the Bankruptcy Court should not be used as a shield for what is arguably criminal conduct.

The Debtor has repeatedly made much of the fact that it could have filed for Chapter 7, but it instead filed Chapter 11 in order to give Consignors the best possible chance of recovery.  The facts of this case belie that specious claim   If the Debtor was serious about repaying its Consignors it wouldn't have hired a childhood friend with no experience at a salary of $174,000 per year, nor would it maintain a luxury lease for Mr. Levine's personal BMW vehicle, nor would it have used funds from the Debtor to buy Mr. Levine a house in Allentown, PA, and a house in Scottsdale, AZ.

This is a case where the Debtor must get people to continue to consign with it in order to make a profit.  After the Debtor has stolen the sales proceeds of 363 of its consignors, who is going to trust the Debtor with their most prized personal possessions?  Who is going to consign with the Debtor now?  Even if they did, would there be enough profit to benefit creditors?  The Debtor's case has been pending for almost three months, and the reports very clearly show that the Debtor is not even generating enough revenue in order to pay all of its own operating expenses, much less generate enough profit to repay its pre-petition Consignors.  Despite this fact, Mr. Levine expresses a disquieting lack of concern, and when asked by one of the Consignors at the Debtor's 341 meeting how the Debtor intends to pay them, Mr. Levine stated,

> I have been in business for a very long period of time and I have had great success in this industry and if I can get consumer confidence back, and, we can sell our way out of this.  That's my plan.
> . . .
> Call me an optimist, but you know we're always just one painting or item away from being able to satisfy everyone.

*See* **Exhibit A**, p. 56 – 57.     The Debtor is banking on another million dollar painting to be found in a garage and consigned to him as the foundation for his Chapter 11 plan of reorganization. That is not realistic, and it is not fair to the creditors of this estate. The sad reality is, the longer this case stays in Chapter 11 with a debtor-in-possession, the longer Mr. Levine and his CEO will have to squeeze every nickel out of the business. As it stands, they are the only people who are benefiting from this case.

WHEREFORE, in order to prevent further mismanagement of the business, to enable an independent trustee to assess and pursue potential fraudulent transfers, preferential payments, and other causes of action, the UST requests that this Court immediately appoint a Chapter 11 trustee, or, in the alternative, convert this case to Chapter 7.

RESPECTFULLY SUBMITTED this 12th day of June, 2019.

ILENE J. LASHINSKY
United States Trustee
District of Arizona

 /s/ RSS (#017473)
RENEE SANDLER SHAMBLIN
Trial Attorney

Copy of the foregoing served
via electronic mail 12th day of June, 2019:

Wesley D. Ray
Michael Galen
Sacks Tierney, P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Counsel for the Debtor
Email:  Wesley.Ray@sacksTierney.com
           Michael.Galen@SacksTierney.com

Members of the Official Committee of Unsecured Creditors
Doug Crandall
Email:  dougcinaz@gmail.com

John R. Trump
Email:  jrtrumpvontromp@gmail.com

Danielle and Jeremy Rovinsky
Email:  rambam@gmail.com

Rami Varsha
Empire Wholesale Jewelry
Email:  Rvarsha1@yahoo.com

Matthew A. Silverman
Assistant Attorney General
Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ  85004
Attorney for the State of Arizona ex rel. Arizona Department of Revenue
Email:  matthew.silverman@azag.gov

Nancy K. Swift
Buchalter
16435 N. Scottsdale Road, Suite 440
Attorneys for  Ford Motor Credit Company
Email:  nswift@buchalter.com

Alissa Brice Castaneda
Quarles & Brady LLP
Two North Central Avenue
Phoenix, AZ  85004
Attorneys for Second Wind Enterprises, LLC
Email:  alissa.castaneda@quarles.com

Rejoy Nalkara
Bankruptcy Servicer for BMW Financial Services NA, LLC
AIS Portfolio Services, LP
4515 N. Santa Fe Ave., Dept. APS
Oklahoma City, OK  73118
Email:  ecfnotices@ascensioncapitalgroup.com

John J. Fries
Ryley Carlock & Applewhite
One North Central Avenue, Suite 1200
Phoenix, AZ  85004
Attorneys for BNC National Bank
Email:  jfries@rcalaw.com

/s/ Christopher Stewart