ILENE J. LASHINSKY (#003073)
United States Trustee
District of Arizona

RENEE SANDLER SHAMBLIN (#017473)
Trial Attorney
230 N. First Ave., Suite 204
Phoenix, Arizona 85003-1706
Phone: (602) 682-2616
Email: Renee.s.Shamblin@usdoj.gov

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

In re:

J. LEVINE AUCTION & APPRAISAL LLC,

Debtor.

In Proceedings under Chapter 11

Case No. 2:19-BK-02843-SHG

**UNITED STATES TRUSTEE'S OBJECTION TO FINAL APPLICATION FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED BY SACKS TIERNEY P.A. AS COUNSEL FOR DEBTOR**

Hearing Date: September 11, 2019
Hearing Time: 2:30 p.m.

The United States Trustee for the District of Arizona ("UST"), by and through the undersigned attorney and in accordance with the administrative duties set forth in 28 U.S.C § 586(a), objects to the *Final Application for Allowance and Payment of Compensation for Services Rendered and Reimbursement of Expenses Incurred by Sacks Tierney P.A. as Counsel for the Debtor* (the "Application")[1], filed by Sacks Tierney P.A. ("Debtor's Counsel"). In this case, the Debtor spent barely three months as a debtor-in-possession before a trustee was appointed due to numerous instances of

---

[1] This is the first and only fee application filed by Debtor's Counsel in this case.

fraud, dishonesty, incompetence, and gross mismanagement, yet Debtor's Counsel seeks to be awarded fees of over $100,000[2] for its futile and doomed efforts. The Debtor's Chapter 11 case cannot, under any stretch of the imagination, be viewed as a success, but that does not dissuade Debtor's Counsel from seeking fees that vastly exceed any benefit to the estate. Furthermore, awarding these fees would diminish any possibility for recovery to the 363 consignor victims whose sales proceeds from the consignment of their personal property were stolen by the Debtor. Debtor's Counsel might reasonably be compensated for filing the petition, schedules and statements, attending the meetings of creditors, and the case management hearing in this case. However, the amount sought in the Application is excessive and inappropriate and should be denied. This Objection is based upon the Court's record, and is explained further in the attached Memorandum of Points and Authorities.

**Memorandum of Points and Authorities**

**A.      Background**

*Case filing.* The Debtor filed its petition under Chapter 11 of the Bankruptcy Code on March 15, 2019 (the "Petition Date").

*Incomplete Documents Lead to Wasted Time and Excessive Fees.* Along with the petition, Debtor's Counsel filed the Debtor's Master Mailing List ("MML"). However, the MML was wholly incomplete, as it omitted the names and addresses of 346 (out of 363) consignors who were owed unpaid sales proceeds. *See* docket no. 4. As a result, roughly 95% of the unsecured creditors in the case were improperly deprived of the requisite, statutory notice of the April 16, 2019, meeting of creditors and, accordingly, the UST was required to conduct a second meeting of creditors on May 16, 2019. Over the course of the next two months, Debtor's Counsel filed *three* subsequent amendments to the MML: the

---

[2] Debtor's Counsel seeks $88,430.65 in the Application, and it was already paid $16,336.66 for pre-petition bankruptcy services, for a total of $104,767.31.

first amended MML was filed on April 4, 2019; the second amended MML was filed on April 10, 2019; and the third amended MML was filed on May 15, 2019. *See* docket nos. 60, 72, and 109.

On March 29, 2019, Debtor's Counsel filed the Debtor's Statement of Financial Affairs (the "SOFA") and Schedules of Assets and Liabilities (the "Schedules"). *See* docket no. 49. Again, the documents were incomplete. Over the next six weeks, Debtor's Counsel filed *four* amendments to the Schedules. The first amended Schedules were filed on April 15, 2019, the second amended Schedules were filed on April 24, 2019, the third amended Schedules were filed on May 14, 2019, and the fourth amended Schedules were filed on June 11, 2019. *See.* docket nos. 75, 82, 106, and 128.

Similarly, Debtor's Counsel filed three amendments to the SOFA. The first amendment was filed on April 15, 2019, the second amendment was filed on April 24, 2019, and the third amendment was filed on May 14, 2019. *See* docket nos. 76, 83, and 107.

***A History of Operating Losses and Post-Petition Revenue that is Insufficient to Pay Operating Expenses***. The Debtor had a history of operating at a loss. In 2016 it reported a loss of $713,665, in 2017 it reported a loss of $1,654,035, and in 2018 it reported a loss of $1,792,740.[3] As consignor confidence is essential for success in the auction house industry, it is bewildering how Debtor's Counsel believed that the Debtor could turn this financial free fall around, particularly because the creditors the Debtor failed to pay in the year preceding its bankruptcy, were its *consignors*. If the Debtor didn't have the trust and the confidence of the consignor community, how would it obtain items to sell at future auctions? An auction house is nothing if people don't trust it enough to consign their personal property with it, and after the Debtor sold the personal property of 363 of its consignors, but failed to pay them their $1,000,000+ in sales proceeds, it was unable to generate the business it needed to survive. Predictably, the Debtor was unable to meet its projections and pay its post-petition operating expenses.

---

[3] The 2016 and 2017 losses were reported on the Debtor's tax returns, and the 2018 loss was reported on its profit & loss statement (because the tax return has not yet been prepared).

The Debtor attached a budget to its cash collateral motion that showed the Debtor's projected income and expenses in 4 week increments for the first 12 weeks of the case. Even if everything went exactly as the Debtor projected, the Debtor was projecting a thin profit with little net income available to repay its creditors. However, for the first 4 week period of the case, the Debtor projected revenue of $378,000, but reported actual revenue that was less than half of that, of just $157,531.77. In the second four week period of the case, the Debtor projected revenue of $381,600, but had actual revenue that was less than half of that, of just $184,116. As a result, the Debtor was unable to pay many of its post-petition expenses and accrued considerable unpaid administrative expenses.

***The Court Appoints a Chapter 11 Trustee, Who Quickly Moves to Convert to Chapter 7.*** Less than three months into the case, on June 12, 2019, the UST filed her *Emergency Motion to Appoint Chapter 11 Trustee; or Alternatively, to Convert Case to Chapter 7* (the "Emergency Motion"). See docket no. 132. Despite the Debtor's poor post-petition financial reality, Debtor's Counsel vigorously opposed the Emergency Motion and filed an objection to both the request for an expedited hearing, as well as an objection to the Emergency Motion. *See* docket nos. 135 and 144. Both objections were overruled, and on June 21, 2019, this Court issued detailed findings of fact and conclusions of law, and directed the UST to appoint a Chapter 11 trustee. On July 1, 2019, this Court entered an order authorizing the appointment of Mr. Peter Davis as Chapter 11 trustee. After just two weeks, on July 15, 2019, the Chapter 11 trustee filed a motion to convert the Debtor's Chapter 11 case to Chapter 7 (the "Conversion Motion") . In the Conversion Motion, the Chapter 11 trustee stated "there is no viable means to reorganize the Debtor and it is in the best interest of estate's creditors to avoid the time and expense involved in preparing a Plan of Reorganization and Disclosure Statement when it is inevitable the assets of the Debtor should be liquidated." *See Conversion Motion*, p. 1. The Chapter 11 trustee further found that, "there is no viable path for this Debtor to attract future business, as the failure to pay consignors for assets sold during past actions [sic] has damaged the goodwill of the Debtor and its

prospects for generation of new business necessary to pay current liabilities and pre-petition creditors. *See Conversion Motion*, p. 2. Finally, the Chapter 11 trustee found that the Debtor's revenues, expenses, assets and liabilities were not properly accounted for, and that the Debtor did not have accurate records of what property was owned by the Debtor or by third parties. *See Conversion Motion*, p. 3. There were no objections filed to the Conversion Motion, and after a hearing, the Court converted the Debtor's case to Chapter 7.

***Ongoing Deficiencies.*** Debtor's Counsel filed operating reports for March and April of 2019. However, although the Debtor was still in possession of the estate in May and June, no operating reports were filed.

***Fee Application and Billing***. The Application seeks an award of **$88,430.65** in fees and expenses for the period of March 15, 2019 through July 26, 2019. When combined with the **$16,336.66** that Debtor's Counsel received for pre-petition bankruptcy services,[4] Debtor's Counsel is seeking to be paid $104,767 for services, which provided little, if any benefit to the bankruptcy estate. Debtor's Counsel ignored the overwhelming evidence of the Debtor's fraud, dishonesty, incompetence, and gross mismanagement, as well as the fact that the Debtor was hopelessly insolvent and unable to pay its ongoing, operating expenses, yet it guided the Debtor into a Chapter 11 case. The UST does not doubt that Debtor's Counsel spent considerable time on this case, but the problem is that no materially productive activity occurred as a result, and the time spent did not benefit creditors. Counseling the Debtor to commence a Chapter 11 reorganization that was not only destined to fail, but that also

---

[4] Although Debtor's Counsel asserts in the Application that it received $11,035.50 for pre-petition bankruptcy services that it applied against its $35,000 retainer, that representation is inconsistent with the Debtor's disclosures in its third amended (and final) SOFA, which provides that the Debtor paid Sacks Tierney a $40,301.16 retainer ($5,000 on December 19, 2018, $8,000 on February 27, 2019, and $27,301.16 on March 11, 2019). *See* SOFA, p. 2, at docket no. 107. Because Debtor's Counsel represents that it has a balance of $23,964.50 held in its trust account, Debtor's Counsel was already paid **$16,336.66**.

exponentially increased administrative expenses while decreasing the creditors' chances for a recovery, is an exercise that should not be rewarded.

**B. Additional Specific Objections to the Application.**

    **1. Failure to Comply with the Fee Application Guidelines[5]**

        **a. Failure to Arrange All Time Entries in Project Categories.** The Fee Application Guidelines require time entries to be reported in chronological order under the appropriate project category. While Debtor's Counsel did provide a total for each project category, the actual supporting time entries are not organized by project category, nor do they identify to which project category they belong, which makes it impossible to reconcile the actual time entries with the project category totals.

        **b. Block Billing.** Mr. Ray does not segregate his time entries and instead they are lumped together. For example, on 03/20/2019, there is a lumped charge for 7.10 hours ($2,591.50); on 3/29/2019, there is a lumped charge for 3.70 hours ($1,350.50); on 4/02/2019, there is a lumped charge for 3.80 hours ($1,387); on 4/05/2019, there is a lumped charge for 1.30 hours ($474.50); on 4/16/2019 there is a lumped charge for 5.30 hours ($1,934.50); on 4/24/2019, there is a lumped charge for 2.10 hours ($766.50); on May 16, 2019, there is a lumped charge for 5.6 hours ($2,044).

    **c. Clerical.** There are numerous attorney and paralegal bills for what appear to be clerical tasks, such as frequent revisions to the SOFA, Schedules, and MML and service of and filing documents.

    **d. Duplication**. Several of the tasks undertaken by Debtor's Counsel appear on each attorney's time sheet, without any explanation as to why it was necessary for attorneys from the same firm to have multiple attendees at the same hearing, meeting, or conference. For example, on 3/20/2019, both Mr. Ray (7.10 hours) and Mr. Galen (3.5 hours) billed to attend a hearing; on 4/2/2019, both Mr.

---

[5] The Fee Application Guidelines are codified in 28 C.F.R. Pt. 58, App. A.

Ray (3.8 hours) and Mr. Galen (1.5 hours) billed to attend a hearing; on April 16, 2019, both Mr. Ray (5.3 hours) and Mr. Galen (4.3 hours) billed to attend the meeting of creditors; and on April 29, 2019, both Mr. Ray (.9 hours) and Mr. Galen (1.5 hours) billed for preparation and participation in a conference call with the client.

**e. Opposition to UST Emergency Motion**. Almost 20% of Debtor's Counsel's bill ($17,000) is spent on time opposing the UST Emergency Motion. In the context of this case, this was an unproductive and wasteful task.

## C. Argument

### 1. Legal Standards

Section 330(a)(1) of the Bankruptcy Code provides that the Court may award estate professionals "reasonable compensation for actual, necessary services rendered by the . . . professional" and "reimbursement for actual, necessary expenses." The professional applying for compensation bears the burden of persuading the court that the fees and expenses sought are reasonable and necessary.[6]

The starting point for an analysis of whether requested fees are reasonable is 11 U.S.C. § 330(a)(3), which describes an approach generally known as the "lodestar" approach. Courts should "consider the nature, the extent, and the value" of professional services, taking into account six factors that include: (1) the time spent on the services; (2) the rates charged; (3) "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title"; (4) "whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature" of the issue; (5) whether the applicant "is board certified or otherwise has demonstrated skill and experience" in the bankruptcy

---

[6] *See Zolfo, Cooper & Co. v. Sunbeam – Oster Co.*, 50 F.3d 253, 261 (3d Cir. 1995); *In re Basham*, 208 B.R. 926, 932 (BAP 9th Cir. 1997), *aff'd sub nom. In re Byrne*, 152 F.3d 924 (9th Cir. 1998); *In re Eliapo*, 298 B.R. 392, 402 (B.A.P. 9th Cir. 2003), *rev'd on other grounds*, 468 F.3d. 592, 604 (9th Cir. 2006).

arena; and (6) "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title."[7]

**2. The Application is Excessive**

Conceptually, Debtor's Counsel should be compensated for preparation of the Debtor's bankruptcy documents,[8] the appearance at the meeting of creditors, and the initial case management hearing. Debtor's Counsel already billed the Debtor $16,366.66 for pre-petition bankruptcy services, so these additional services might reasonably have been billed at $10,000 to $15,000, bringing total fees to around $25,000 to $30,000. No other services were rendered that benefitted the estate or creditors. Yet the Application is well in excess of this amount.

Before undertaking specific tasks, estate professionals must consider whether the probable cost of legal services would be disproportionately large in relation to the size of the estate and the maximum probable recovery; whether the estate would suffer if the services were not rendered; and to what extent the estate might benefit if the services were rendered and how likely it is that disputed issues would be resolved successfully.[9] Professionals have a duty to conduct their work so that the resulting expenditures of estate assets are proportionate to the level of potential recoveries resulting from that work.[10]

Here, the Debtor's estate was insolvent with inadequate funds to satisfy post-petition, ongoing, administrative expenses. Further, given the Debtor's failure to pay its consignors their sales proceeds

---

[7] 11 U.S.C. § 330(a)(3).
[8] Such as the petition, and an *initial* set of Schedules, SOFA, and MML.
[9] *Unsecured Creditors Comm. V. Puget Sound Plywood, Inc*. 924 F.2d 955, 961 (9th Cir. 1991).
[10] *In re Auto Parts Club, Inc*., 211 B.R. 29, 33-35 (B.A.P. 9th Cir. 1997); see also In re Ward, 894 F.2d 771, 777 (5th Cir. 1990)(if the benefit to the estate of the professional's efforts is uncertain, the application should be reevaluated in conjunction with a final award); *In re Tamarack Trail Co*., 25 B.R. 259, 260 (Bankr.S.D. Ohio 1982) (reducing fee award to debtor's attorney because proposed plan of reorganization was rejected by creditors and was of little benefit to the estate); *In re Office Prods. of Am., Inc*., 136 B.R. 983,990 (W.D. Tex. 1992)(the efforts of debtor's counsel in pursuing a plan provides no benefit to the estate "*if* it is clear from the context of the case that the debtor and its counsel knew or should have known from the outset that the plan could *not* satisfy the requisites of §1129(a)"); *In re Universal Factoring Co*., 329 B.R. 62, 79 (N.D. Okla. 2005)("In order to benefit the estate, the services rendered must relate to a realistically obtainable goal.").

from previous auctions, it had irretrievably damaged its goodwill and its prospects to generate new business. Within this context, Debtor's Counsel should have known that Chapter 11 was an inappropriate choice, and there was no viable path for the Debtor to successfully reorganize. Given these realities, Debtor's Counsel had a duty to carefully constrain expenses of administration in order to obtain the best result for the estate. Debtor's Counsel acted in the opposite manner.

### a. Counsel Should Not be Compensated For Wasteful Tasks

Time wasted should not be compensable. According to Section 330(a)(4), a professional should not be compensated for unnecessary duplication of services or for "services that were not . . . reasonably likely to benefit the debtor's estate; or . . . necessary to the administration of the case."[11] There are many examples in the Application of wasted time, including multiple lawyers billing for attending the same hearing, meeting, or conference, and preparing numerous amendments to routine bankruptcy documents.

### b. Counsel Should Not Be Compensated For Useless Work

Useless effort should not be compensable. The Court must disallow compensation in instances of (1) "unnecessary duplication of services"; or (2) services that were not reasonably likely to benefit the debtor's estate" or "necessary to the administration of the case."[12] It is difficult to see how this Chapter 11 could have ever benefited the Debtor's consignors and creditors. Perhaps, more appropriate guidance would have been for the Debtor to file Chapter 7, instead of wasting the estate's time and limited resources in a Chapter 11.

### c. Application Must Contain Sufficient Information for the Court to Evaluate It.

Courts regularly refuse to approve fee applications that are not appropriately supported.[13] Lumped time

---

[11] 11 U.S.C. §330(a)(4).
[12] *In re Las Vegas Monorail Co.*, 458 B.R. 553, 556 (Bankr. D. Nev. 2011).
[13] *In re York Int'l Bldg., Inc.*, 527 F.2d 1061,1069 (9th Cir. 1975) (reducing the award of fees to a trustee who filed an inadequate fee application).

entries, or block billing that does not segregate the time entries is inappropriate.[14] In addition, the Fee Application Guidelines require time entries to be reported in chronological order under the appropriate project category. *See 28 C.F.R. Pt. 58, App. A.* While Debtor's Counsel did provide a total for each project category, the actual supporting time entries are not organized by project category, nor do they identify to which project category they belong, which makes it impossible to reconcile the actual time entries with the project category totals.

## D. CONCLUSION

Services that did not benefit the estate should not be compensated by the estate. Given the results obtained, few, if any, of the services provided by Debtor's Counsel provided a benefit to the estate. Debtor's Counsel was paid $16,336.66 for pre-petition bankruptcy services, and it seeks an additional $88,430.65 for three months of post-petition services. These fees are excessive. The UST submits that, to the extent the Court is inclined to grant the Application, a more reasonable amount of fees would be $10,000 to $15,000.

RESPECTFULLY SUBMITTED this 20th day of August, 2019.

ILENE J. LASHINSKY
United States Trustee
District of Arizona

 /s/ RSS (#017473)
RENEE SANDLER SHAMBLIN
Trial Attorney

---

[14] *In re Baker*, 374 B.R. 489, 496 (Bankr. ED.N.Y. 2007) (reducing amount of fees awarded to professional that submitted vague time entries and engaged in improper block billing).

Copy of the foregoing served
via electronic mail this 20th day of August, 2019 to:

Wesley D. Ray
Michael Galen
Sacks Tierney, P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Counsel for the Debtor
Email: Wesley.Ray@sackstierney.com
Michael.Galen@sackstierney.com

Maureen Gaughan
PO Box 6729
Chandler, AZ 85246-6729
Chapter 7 Trustee
Maureen@mgaughan.com

Steven J. Brown
Steve Brown & Associates, LLC
1414 E. Indian School Road, #200
Phoenix, AZ 85014-2412
Email: sbrown@sjbrownlaw.com

Doug Crandall
Email: dougcinaz@gmail.com

John R. Trump
Email: jrtrumpvontromp@gmail.com

Danielle and Jeremy Rovinsky
Email: rambam@gmail.com

Rami Varsha
Empire Wholesale Jewelry
Email: Rvarsha1@yahoo.com

Matthew A. Silverman
Assistant Attorney General
Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004
Attorney for the State of Arizona ex rel. Arizona Department of Revenue
Email: matthew.silverman@azag.gov

Nancy K. Swift
Buchalter
16435 N. Scottsdale Road, Suite 440

| | |
|---|---|
| 1 | Attorneys for Ford Motor Credit Company |
| 2 | Email: nswift@buchalter.com |
| 3 | Alissa Brice Castaneda |
|   | Quarles & Brady LLP |
| 4 | Two North Central Avenue |
|   | Phoenix, AZ  85004 |
| 5 | Attorneys for Second Wind Enterprises, LLC |
| 6 | Email:  alissa.castaneda@quarles.com |
| 7 | Rejoy Nalkara |
|   | Bankruptcy Servicer for BMW Financial Services NA, LLC |
| 8 | AIS Portfolio Services, LP |
|   | 4515 N. Santa Fe Ave., Dept. APS |
| 9 | Oklahoma City, OK  73118 |
| 10 | Email:  ecfnotices@ascensioncapitalgroup.com |
| 11 | John J. Fries |
|    | Ryley Carlock & Applewhite |
| 12 | One North Central Avenue, Suite 1200 |
|    | Phoenix, AZ  85004 |
| 13 | Attorneys for BNC National Bank |
| 14 | Email:  jfries@rcalaw.com |
| 15 | |
| 16 | /s/ Renee Shamblin |